IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARYLAND GENERAL HOSPITAL, INC. :
 d/b/a TRANSITIONAL CARE CENTER
                                :
v.                                      Civil Action WMN-00-221
                                :
TOMMY G. THOMPSON, SECRETARY OF
 THE UNITED STATES DEPT. OF     :
 HEALTH AND HUMAN SERVICES

**MEMORANDUM**

Before the Court are cross motions for summary judgment. Paper Nos. 14 (Plaintiff's) and 19 (Defendant's). The motions are fully briefed and a hearing on the motions was held on March 23, 2001. Upon a review of the motions and the applicable case law, the Court determines that Defendant's motion should be granted, and Plaintiff's denied.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

In 1994, Plaintiff Maryland General Hospital determined to open a hospital based skilled nursing facility (SNF). At issue in this action is whether Defendant erred in denying that facility "new provider" status for the purpose of determining the rate of reimbursement under Medicare. Understanding the context of this dispute requires a brief overview of Maryland's regulation of licensed hospital and nursing care facility beds, as well as Medicare reimbursement regulations.

The number of hospital and nursing care facility beds are tightly regulated by the State. To create or expand a health care facility generally requires obtaining a Certificate of Need

(CON) from the Maryland Health Resources Planning Commission (Commission). State regulations, however, allow an existing facility to add up to 10 beds without obtaining a CON. COMAR 10.24.01.02. This inchoate right to add these additional beds is referred to as "bed credits" or "waiver beds."

When Plaintiff decided to open its SNF, it determined that the easiest way to start the facility was to purchase bed rights from other existing providers. Accordingly, Plaintiff proceeded to enter into contracts with three local nursing facilities to purchase bed rights: 10 from Villa St. Michael, 6 from Granada Nursing Home, and 8 from the Wesley Home (collectively, the Selling Facilities). As these purchases of bed rights were originally contemplated, Plaintiff would purchase operational beds from the Selling Facilities and those facilities would then replace them by activating their waiver bed rights. The contracts drawn up by the parties and all of the contemporaneous documentation reflected this understanding of the transaction. As it turns out, however, the Commission treated the transactions as simply the transfer of waiver beds from the Selling Facilities to Plaintiff.[1]

---

[1] There is some dispute as to what motivated the re-characterization of the transaction. It was not until approximately one year after the initial denial of the new provider exemption that anyone asserted that the transfer involved anything other than licensed and operational beds. Long after the denial and at the request of Plaintiff, the Commission issued a letter stating that waiver beds, and not operational

The relevant Medicare regulations in effect during the applicable time period provided as follows. The Medicare program reimbursed SNFs such as Plaintiff for their actual "reasonable costs" of providing inpatient services to Medicare patients, subject to certain upper limits. 42 U.S.C. §§ 1395f(b), 1395(v)(1)(A). Because new providers of skilled nursing services are likely to experience higher per patient per diem costs because of start up costs and lower occupancy levels, the Health Care Financing Administration (HCFA), promulgated regulations that exempted new providers from the routine cost limits for their first few years of operation. 42 C.F.R. § 413.30(e)(1996). Section 413.30(e) provides:

> Exemptions. Exemptions from the limits imposed under this section may be granted to a new provider. A new provider is a provider of inpatient services that has operated as the type of provider (or the equivalent) for which it is certified for Medicare, under present and previous ownership, for less than 3 full years. An exemption granted under this paragraph expires at the end of the providers first cost reporting period beginning at least two years after the provider accepts its first patient.

---

beds had been transferred. Thus, one could conclude that the recasting of the transactions was made to aid Plaintiff in challenging the denial. There is also evidence in the record that the Commission treated the transaction as a transfer of waiver beds merely for its own administrative convenience, "to avoid the rigmarole of delicensing at the nursing homes, relicensing additional beds." Administrative Record (A.R.) at 209 (testimony of Plaintiff's expert witness).

3

In December 1995, Plaintiff submitted an application for a new provider exemption to its Intermediary.[2] The Intermediary passed the application on to HCFA with the recommendation that the new provider exemption be granted. HCFA denied the application. As was its right, Plaintiff appealed the decision to the Provider Reimbursement Review Board (PRRB) which reversed the decision of HCFA, in a three to two split decision. The HCFA Administrator elected to review the decision of the PRRB and reversed the Board's decision, holding that the application should be denied.[3] <u>Maryland General Hospital Transitional Care Center v. Blue Cross & Blue Shield Assoc.</u>, 1999 WL 33105616, (H.C.F.A. November 22, 1999). The Administrator's decision represents a final agency action of the Secretary and Plaintiff filed this action seeking judicial review.

## II. **STANDARD OF REVIEW**

Judicial review of final agency decisions on Medicare provider reimbursement disputes is guided by the provisions of the Administrative Procedure Act, 5 U.S.C. § 701, <u>et seq.</u> (APA).

---

[2] Medicare payments are made through fiscal intermediaries pursuant to contracts with the Secretary. During the relevant time period, Plaintiff's Intermediary was Blue Cross and Blue Shield Association.

[3] While Plaintiff was denied the new provider exemption, Plaintiff has been granted "exceptions" to the routine cost limits for two of the cost years in question pursuant to 42 C.F.R. § 413.30(f)(1), based on "atypical" services. According to Defendant, additional payments to Plaintiff based on these exceptions amounted to hundreds of thousands of dollars.

4

See 42 U.S.C. § 1395oo(f). Under the APA, a court shall not set aside an agency action, findings, or conclusions, unless the same are found by the court "to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . ." 5 U.S.C. § 706(2)(A).

Under this standard, "there is a presumption in favor of the validity of administrative action," and courts are particularly deferential when an agency, as here, is interpreting its own statute and regulations. United States v. Rutherford, 442 U.S. 544, 553 (1979). The agency action "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)(internal quotations omitted). While a reviewing court is to show a proper deference to the expertise of the agency, the court should make a "searching and careful" inquiry of the record in order to ascertain whether the agency decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). Under this narrow scope of review, however, "[t]he court is not empowered to substitute its judgment for that of the agency." Id.

## III. DISCUSSION

In reversing the PRRB's decision and denying Plaintiff's

request for a new provider exemption, the Administrator found that the record supported the conclusion that Plaintiff's SNF "was created based upon the purchase and relocation of existing beds which had been used for equivalent comprehensive care services for more than three years at the seller-facilities." 1999 WL 33105616 at *10. While the Administrator deemed Plaintiff's contention that it was only waiver beds that were transferred a "post-hoc characterization" for the purpose of this litigation, he also noted that "regardless of whether the beds are characterized as 'operational beds' or 'waiver beds,' there was a CHOW [change of ownership] for purposes of the new provider exception." Id. at *11. Finally, the Administrator concluded that Plaintiff's SNF was located in the same service area as the previous owners, and thus, was not entitled to the application of section 2533.1B.3 of the Provider Reimbursement Manual. That section allows an exemption where there has been a relocation of a facility to an area where the previous patient population may no longer be served. Id. at *12.

Plaintiff does not take issue with the Administrator's position that the Selling Facilities were providing services equivalent to those of the Plaintiff for more than three years, or that the Selling Facilities and Plaintiff's SNF were located in the same service area. Nor does Plaintiff disagree that, if licensed and operational beds were transferred, that would have

been a CHOW and the new provider exemption would have been properly denied. Plaintiff takes issue with the Administrator's conclusion that operational beds, and not waiver beds, were transferred. Furthermore, in Plaintiff's view, the transfer of waiver beds does not constitute a CHOW.

The Court does not believe that it is necessary to decide whether it was operational beds or waiver beds that were sold and transferred, for the Court concludes that the transfer of any beds, be they operational or simply waiver beds, is an adequate basis for denying new provider status. In reaching this conclusion, the Court is guided by the Seventh Circuit's recent decision in Paragon Health Network, Inc. v. Thompson, - F.3D -, 2001 WL 605711 (7th Cir. June 5, 2001). Although Paragon arises in the context of a transfer of licensed and operational beds, the analysis employed by the court in reviewing the Secretary's decision in that context seems applicable here.[4]

In Paragon, the plaintiff opened a SNF in downtown Milwaukee. Because Wisconsin regulates nursing facilities in a

---

[4] The parties have not identified and the Court is not aware of any reported Medicare reimbursement decision arising in the context of the transfer of waiver beds.

In the context of the transfer of CON rights for operational beds, the PRRB has consistently held that the receiving institution is not entitled to new provider status. See, e.g., Providence Yakima Medical Center v. Blue Cross & Blue Shield, 2001 WL 599895 (PRRB May 16, 2001); Ashtabula County Med. Ctr. Skilled Nursing Facility v. Blue Cross & Blue Shield, 2000 WL 875714 (PRRB June 29, 2001).

manner similar to Maryland, the plaintiff opened the new facility by purchasing and transferring CON rights for 35 beds from another facility it owned in a suburb of Milwaukee. Prior to the transfer, the selling facility had 403 beds and it continued to operate as a separate facility after the transfer. "The only thing that [the new SNF] received from [the selling facility] were the CON rights; no residents, staff, or equipment were transferred." Id. at *1. Because the new facility was created using transferred CON rights, the Secretary denied the plaintiff new provider status and the plaintiff challenged that decision in the district court. The district court affirmed the Secretary's decision, and plaintiff appealed.

On appeal, the plaintiff focused on the meaning of "provider" in the phrase "provider of inpatient services that has operated . . . under present and previous ownership." The plaintiff argued that "'provider' consists of all those attributes necessary for a SNF to operate – that is, not just CON rights, but physical beds, employees, administrators, equipment, patients, referral sources, etc." Id. at *5. Thus, in the plaintiff's view, "only when the SNF as an entire operating institution is transferred to a new owner can the exemption for a new provider be denied." Id.

The Seventh Circuit disagreed, finding that the word "provider" was ambiguous as used in the regulation. The court

8

explained that a facility might fire its whole staff and hire an new one, or modernize all of its equipment, and yet would remain the same "provider." Of course, at the point that all of the various elements that make up a SNF are "new," in the sense that they have never been a part of another facility, the SNF must be considered a "new provider." In the court's view, it was the difficulty in drawing the line as to when enough of the elements are "new" so as to deem a SNF a new provider that makes the word "provider" ambiguous as used in § 413.30(e). Id. at *5.

Having concluded that the word "provider" was ambigous, the court proceeded to determine whether the Secretary's interpretation was plainly erroneous or inconsistent with the text. In responding to the plaintiff's argument that the Secretary should not rely on CON rights alone in determining whether a SNF operated under previous ownership, the Seventh Circuit responded,

> Paragon's argument does have a degree of merit -- terms like "operate[]" and "provider" suggest that one should look to whether a group of attributes making up the institution have changed such that the SNF may be described as new, rather than just focusing on a single characteristic, such as CON rights. Nevertheless, we conclude that the Secretary's interpretation is not so much at variance with the language of the regulation as to be deemed plainly erroneous or inconsistent with the text. Medicare is a highly complex and technical program, and so deference to the Secretary's determinations in the course of administering the system is especially warranted. Thomas Jefferson, 512

9

> U.S. at 512 []. Furthermore, an agency need not adopt the most natural reading of the regulation, but only a reasonable one. <u>Pauley v. BethEnergy Mines, Inc.</u>, 501 U.S. 680, 702 [] (1991). The Secretary explains that a transfer of CON rights does not result in the provision of any new services. Even though the transferee might have new equipment, staff, etc., it will provide the same kind of services as the transferor of the CON rights, just at a different location. We cannot say that the Secretary's interpretation that because no new services are being provided there is not a new provider is unreasonable.

<u>Paragon</u> at *5 (emphasis added).

The plaintiff in <u>Paragon</u> also raised several policy arguments against the Secretary's interpretation, the primary argument being one also raised by Plaintiff in this action. Referring to the purpose of the new provider exemption, <u>i.e.</u>, to allow a provider to recoup the higher costs normally resulting from low occupancy rates and one time start-up costs, the plaintiff observed that "the receipt of CON rights from [the selling facility] did nothing to ameliorate these expenses." <u>Id.</u> at *6. The plaintiff in <u>Paragon</u>, as did Plaintiff here, "incurred large start-up costs and had a very low occupancy rate, resulting in high costs per patient." <u>Id.</u>

Without challenging that observation, the court held that the Secretary's interpretation was nonetheless consistent with the regulation. During the relevant time period, Medicare

reimburses SNFs for "reasonable costs."[5] Excluded from the definition of "reasonable costs" was any "cost found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395f(b)(1). The Secretary reasoned, and the court concurred,

> that the transfer of CON rights simply shifts around SNF services. Creating a new facility and moving services to it, as [the plaintiff did between the new facility and the selling facility], is costly, but no benefit is gained in the overall delivery of health care services if the new facility is providing the same services to the same population as the old one. Thus, the Secretary's judgment that the high startup costs of [the new facility] were "unnecessary in the efficient delivery of needed health services" is a reasonable one that will not be disturbed by this Court.

Id.

While transferring non-operational waiver beds might result in fewer unnecessary costs than the transfer of operational beds, a similar observation could be made here. Transferring waiver beds to a new institution and bringing them into operation is clearly more costly than an on site activation of waiver beds as part of an ongoing facility with access to existing staff, administration, and referral network to lower start up costs and avoid the initial lower occupancy levels.

In trying to arrive at a different result, Plaintiff argues

---

[5] As of July 1, 1998, Medicare began reimbursing SNFs on a "prospective payment system." 42 U.S.C. § 1935yy(e).

that the test as to whether an exemption is granted under § 413.30(e) should be "whether the transferred assets were 'operated' by a prior owner." Plaintiff's Reply at 3; see also, Plaintiff's Motion at 15 ("The key word in this definition of 'new provider' is 'operated.' . . . It contradicts the plain language of the regulation to interpret the word 'operated' to include Waiver Beds that have never been previously 'operated.'"). Section 413.30(e), however, nowhere speaks of assets being operated or not operated. The question is whether "the provider . . . has operated." Here, there is no dispute that the previous owners of the transferred assets were operated as the same type of provider as Plaintiff's SNF.

Perhaps the strongest rationale, in this Court's view, for denying new provider status where waiver beds were transferred, is the ease by which the transaction was re-characterized by the Commission. It is undisputed that Plaintiff and the Selling Facilities entered in the transaction anticipating that operational beds would be transferred. Aside from the impact on Plaintiff's new provider status, Plaintiff makes no argument that there was any practical significance to whether the transferred beds were deemed waiver beds or operational beds. Furthermore, Plaintiff concedes that it was not entitled to new provider status under the terms of the transaction into which it believed it was entering. See Plaintiff's Reply at 3 ("[i]f the

transferred assets were actually 'operated' previously as a functioning and recognized part of a licensed facility, new provider status would not be warranted"). That a year later the Commissioner fortuitously chose to re-cast the transaction as the transfer of waiver beds (whether for administrative convenience or some other reason) should not impact the Secretary's determination of new provider status.

## IV. CONCLUSION

For these reasons, the Court finds that Defendant's decision was supported by the record and was neither arbitrary nor capricious. Accordingly, Defendant's Motion for Summary Judgment will be granted. A separate order will issue.

_____
William M. Nickerson
United States District Judge

Dated: June 27, 2001.